# In the United States Court of Federal Claims

No. 15-336C

(Filed: October 8, 2019)

| | | |
|---|---|---|
| **ROCKY MOUNTAIN HELIUM, LLC** | ) | Remanded claim for breach of a settlement |
| | ) | agreement; contractual obligations under the |
| **Plaintiff,** | ) | settlement agreement; liability |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Bryant Steven Banes, Neel, Hooper & Banes, P.C., Houston, TX, for plaintiff.

Jimmy S. McBirney, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Allison Kidd-Miller, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

This contract case returns to the court on remand from the United States Court of Appeals for the Federal Circuit.  Plaintiff Rocky Mountain Helium, LLC ("Rocky Mountain") had brought suit in this court against the Bureau of Land Management ("BLM" or "the government") alleging, *inter alia*, that BLM breached the terms of a contract to extract helium from natural gas wells on federal lands, and also had breached a settlement agreement entered into by the parties to resolve a dispute over the underlying contract.  Compl. ¶ 3.  The court dismissed the helium contractual claim on the merits and on jurisdictional grounds and dismissed the settlement-agreement claim for lack of subject-matter jurisdiction.  *See generally Rocky Mountain Helium, LLC v. United States*, 123 Fed. Cl. 551 (2015).  Rocky Mountain appealed.  *See generally Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320 (Fed. Cir. 2016).  On appeal, the Federal Circuit reversed the jurisdictional dismissal of the helium contractual claim but affirmed the dismissal of that claim on the merits.  *Id*. at 1326.  Separately, the court of appeals concluded that this court did have subject-matter jurisdiction over the claim that the settlement agreement had been breached and remanded the case for further proceedings.  *Id*. at 1326-27.  When the remanded case returned to this court, it was transferred from the originally assigned judge to the undersigned.

In addressing the remanded case, on August 9, 2019, the government filed a motion for summary judgment on the question of liability.  *See* Def.'s Mot. for Summary Judgment ("Def.'s Mot."), ECF No. 105.  Rocky Mountain responded with a cross-motion for summary judgment on September 6, 2019.  *See* Pl.'s Cross-Mot. for Summary Judgment & Opp'n to Def.'s Mot. ("Pl.'s Cross-Mot."), ECF No. 108.  The government filed a reply in support of its motion and in opposition to Rocky Mountain's cross-motion on September 20, 2019, *see* Def.'s Reply to Pl.'s Response ("Def.'s Reply"), ECF No. 109, and Rocky Mountain filed a reply on September 24, 2019, *see* Pl.'s Reply to Def.'s Reply ("Pl.'s Reply"), ECF No. 110.  A hearing was held on September 26, 2019.

The court concludes that BLM breached the terms of the settlement agreement.  Accordingly, the government's motion for summary judgment is DENIED and Rocky Mountain's cross-motion for summary judgment is GRANTED.

## BACKGROUND

The origins of this dispute trace back to a contract between BLM and Rocky Mountain which they entered in 1994.  BLM granted Rocky Mountain the right to extract helium gas from federal lands in Colorado and Utah, stipulating in return that Rocky Mountain "annually pay to the United States either rent of one dollar per acre (*i.e.*, roughly $21,000) or royalties based on the helium that Rocky Mountain extracted, whichever was greater."  *Rocky Mountain Helium*, 841 F.3d at 1321 (citing Federal Helium Contract FLL 94-001).  The roughly 21,500 acres of federal land involved were subject to leases between the United States and certain oil and gas lessees ("O&G lessees").  *See* Pl.'s First Am. Compl. Ex. 7 at 53, ECF No. 27.  Those lease agreements, however, reserved to the United States ownership of, and the right to extract, helium beneath the land—thus permitting BLM to grant extraction rights to Rocky Mountain.  *See id.*

In the decade that followed, Rocky Mountain neither extracted any helium nor paid BLM any rent due after the first year.  *Rocky Mountain Helium*, 841 F.3d at 1322.  Consequently, in December 2004, BLM informed Rocky Mountain that, due to its nonpayment, it had cancelled the contract, leading Rocky Mountain to file an administrative appeal with the Civilian Board of Contracts Appeals ("CBCA").  *Id.*  While that appeal was pending before the CBCA, the parties reached a settlement and entered into an agreement—the terms and performance of which are at issue here.  *See* Def.'s Mot. App. at 1-13 ("Settlement Agreement").[1]

Recognizing "that helium is a valuable resource," the agreement's stated purpose was to facilitate the "recovery of helium" by implementing the parties' contract.  Def.'s Mot. App. at 1.  The agreement would allow Rocky Mountain to install facilities for extraction of helium from the vent stream at the Badger Wash Gas Plant located on the leased lands, where extracted gas was already being processed.  *See id.* App. at 3-4.[2]  But Rocky Mountain needed certain

---

[1]The government appended to its motion for summary judgment a compendium of documents pertinent to issues arising with the Settlement Agreement, totaling 180 pages.  That Appendix will be cited by page number, *e.g.*, "App. at ___."

[2]The helium comprising part of the produced gas stream is found in the vent gas at the Badger Wash Gas Plant.  The plant processes produced gas into natural gas for pipeline delivery,

technical data to assess whether the Badger Wash Gas Plant processed sufficient helium-bearing gas to render the pursuit of helium extraction commercially and technically feasible.  *See id.* App. at 127.  In other words, Rocky Mountain was not willing to make the "multi-million dollar capital expenditure" necessary to install the helium recovery facilities "without, at a minimum, confirmation there can be a return of that investment from sources of helium gas supplying the helium recovery facility." *Id.* App. at 138.  To that end, the agreement required BLM to "direct the O&G Lessees to provide [BLM] the Data as described in Exhibit A" of the settlement agreement.  Def.'s Mot. App. at 7-13 ("Settlement Agreement"); *id.* App. at 2 (§ II.1).  "[A]fter its receipt thereof" from the O&G lessees, BLM was then required to "provide the Data to [Rocky Mountain]" within 60 days. *Id.* App. at 3.  Rocky Mountain's receipt of the data triggered an obligation to pay BLM $116,579.90 within ninety days, and upon receiving payment, BLM agreed to "formally reinstate the [c]ontract." *Id.* App. at 2 (§ I.1, .3).  A sunset provision, however, stated that if Rocky Mountain failed to pay within the required ninety days, it agreed "to completely and forever release any and all claims, rights, and/or interest in or arising from" the helium contract. *Id.* App. at 4-5 (§ II.1).

Exhibit A of the Agreement set forth the "data to be provided by O&G lessees," Def.'s Mot. App. at 8-9 (Ex. A ¶ 1), and listed the three O&G lessees at the time of the Agreement—Foothills Energy Ventures ("Foothills"), Augustus Energy Partners ("Augustus"), and Lone Mountain Production Company ("Lone Mountain"). *Id.* App. at 9 (Ex. A ¶ 3).  The exhibit permitted the O&G lessees some flexibility by allowing them to choose to provide one of two alternative sets of data (enumerated in Ex. A ¶¶ 1, 2, respectively). *See id.* App. at 8-9.  Paragraph 1(a)-(d) required them to provide documents setting out raw data about gas composition of produced gas (for determining helium content), vent gas quantity, composition, temperature, and pressure, well logs, and production records. *Id.* App. at 8 (Ex. A ¶ 1).  In lieu of the raw data described in Paragraph 1, Paragraph 2(a)-(d) permitted O&G lessees instead to submit statements—"prepared consistent with industry standards and practices verified by a qualified petroleum engineer and/or geologist," *id.* App. at 8-9 (Ex. A ¶ 2),—about current produced gas composition, the vent gas composition, reserve estimates, the quantities of natural gas produced from the leased lands during the past twenty-four months, and the monthly quantities of vent stream gases vented during the same period. *Id.* App. at 8-9 (Ex. A ¶ 2).  Thus, Paragraph 2 gave the O&G lessees an alternative option to satisfy the information request if any of the raw data enumerated in Paragraph 1 was unavailable or did not exist.

On September 26, 2008, BLM sent a letter to each of the three O&G lessees requesting that they furnish the data listed in an enclosed attachment, which copied verbatim the data listed in Exhibit A of the Settlement Agreement.  Def.'s Mot. App. at 14-17.  The O&G lessees opted to provide the information required by Paragraph 2, *id.* App. at 14, and BLM then forwarded the data it received from the O&G lessees to Rocky Mountain on December 3, 2008, *see id.* App. at 19-126.

_____

"Sold NGLs" (liquids comprised of ethane and higher hydrocarbons), and vent gas.  The vent gas stream contains helium, nitrogen, carbon dioxide, hydrogen sulfide, and other gaseous components. *See* Def.'s Mot. App. 21-55 (Report of Badger Midstream Services, LLC, the operator of the Badger Wash Gas Plant).

Rocky Mountain found the data inadequate to "evaluate the feasibility of helium recovery from the [Badger Wash Gas Plant]" or satisfy the Settlement Agreement's data requirements. Def.'s Mot. App. at 128.  In a letter dated February 26, 2009 to the O&G lessees and BLM, Rocky Mountain commented that "[a]fter a review of the information forwarded to us by the BLM and independent research of Utah and Colorado oil & gas agency databases, the source(s) of approximately 50% of the gas volumes processed by the [Badger Wash Gas Plant] still cannot be identified." *Id.* App. at 128, 130.  BLM disagreed, asserting in a reply dated March 2, 2009, that Rocky Mountain had "been provided the relevant information . . . . [,] meeting, in full, Exhibit A, part 2(a)-(d)." *Id.* App. at 132.  In a letter dated March 13, 2009, Rocky Mountain again reiterated the inadequacy of the data provided, enumerating four specific deficiencies: (1) the lack of data to identify the wells producing approximately 50% of the gas volumes processed into the Badger Wash Gas Plant; (2) the absence of any gas samples or reserve estimates relating to the Bar-X wells (which constituted about one quarter of the Badger Wash Gas Plant intake volumes); (3) the failure of Augustus Energy to provide any data disclosures whatsoever; and (4) insufficient data to determine the "current gas composition of the natural gas beneath, and produced from, the Leased Lands." *Id.* App. at 137-39.  On April 3, 2009, BLM provided additional gas analysis from the Bar-X wells but refused to provide records or estimates of monthly wellhead or vent stream gases, asserting that this "information is unavailable and cannot be provided." *Id.* App. at 149.  The parties also attempted, unsuccessfully, to resolve the matter by invoking the assistance of a judge of the CBCA.  *See Rocky Mountain Helium*, 841 F.3d at 1326.

After a series of letter exchanges and payment extensions, none of which yielded agreement about the disputed deficiencies in the data, BLM notified Rocky Mountain on April 21, 2009 that it intended to invoke the sunset provision for nonpayment and regarded the helium contract "fully, finally, and permanently terminated."  Def.'s Mot. App. at 160.  Ultimately, Rocky Mountain brought suit in this court on April 1, 2015, alleging that BLM had breached the settlement agreement.  *See* Compl.

The Federal Circuit's remand mandates that the court address Rocky Mountain's claim that BLM did not properly implement its responsibilities under the Settlement Agreement.  *See Rocky Mountain Helium*, 841 F.3d at 1320.  The parties' cross-motions for summary judgment focus on that issue and now are before the court for disposition.

## STANDARDS FOR DECISION

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC").  A fact is material when it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (interpreting Fed. R. Civ. P. 56).[3]  A genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor of either party.  *Id.* at 250.

---

[3]Because RCFC 56 mirrors Fed. R. Civ. P. 56, they should be interpreted *in pari materia*.

4

The movant bears the burden of demonstrating the absence of any genuine disputes of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), which requires the movant to "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," RCFC 56(c)(1)(A).   The court may consider other materials in the record even if not cited by the parties.  RCFC 56(c)(3).  "[T]he inferences to be drawn . . . must be viewed in the light most favorable to party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  If the record taken as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

When the parties have cross-moved for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) (citations omitted).  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Id.*  "To the extent there is a genuine issue of material fact, both motions must be denied." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 969 (Fed. Cir. 2009).

### *B.  Contract Interpretation*

"It is axiomatic that a settlement agreement is a contract." *Greco v. Department of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988).  Furthermore, the "interpretation of the terms of a contract is a question of law." *Id.*  The contract's provisions "must be considered as a whole and interpreted to effectuate [their] spirit and purpose, giving reasonable meaning to all parts." *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).  When engaging in contract interpretation, "[t]he starting point . . . is the plain language of the agreement." *Cheaves v. United States*, 108 Fed. Cl. 406, 409 (2013) (citing *Foley v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).  The court should "look first to the terms of the agreement itself . . . to determine the intent of the parties at the time they contracted, as evidenced by the contract itself." *Greco*, 852 F.2d at 560.  Moreover, where the language of a contract is unambiguous, review is generally limited to the contract itself, but trade practice and custom are available to inform meaning so long as they do not "create ambiguity where there otherwise is none." *Cheaves*, 108 Fed. Cl. at 409 (citing *Metric Constructors, Inc. v. National Aeronautics and Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999)).

Breach of contract occurs when a party "is in material non-compliance with the terms of the contract." *Gilbert v. Department of Justice*, 334 F.3d 1065, 1071 (Fed. Cir. 2003).  Non-compliance is material "when it relates to a matter of vital importance, or goes to the essence of the contract." *Thomas v. Department of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur L. Corbin, *Corbin on Contracts* § 1104 (1964)).  Therefore, the determination of whether a party is in breach of contract is a mixed question of law and fact that

5

requires deciding both what the terms of the contract required and whether the allegedly breaching party did or did not perform in conformity with those terms. *See Gilbert*, 334 F.3d at 1071-72 (citing *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997)). Thus, where facts are undisputed, "the determination of whether there has been material non-compliance with the terms of a contract, and hence breach, necessarily reduces to a question of law." *Id.* (citation omitted).

## ANALYSIS

The parties do not dispute that Rocky Mountain never paid BLM $116,579.90 due under the Settlement Agreement once the O&G lessee's data was in hand. Therefore, the court must determine whether Rocky Mountain's obligation to pay was ever triggered by BLM's fulfillment of its obligations under the Agreement. If BLM failed to satisfy its obligations, then BLM breached the agreement and Rocky Mountain had no obligation to pay.

The government argues that it is entitled to summary judgment because there is no genuine dispute of material fact that: (1) BLM "directed" the O&G lessees to furnish the data via letters that copied verbatim the language from Exhibit A of the Agreement; (2) BLM "provided" the data that it received in response from the O&G lessees; and (3) Rocky Mountain never made any portion of its payment. *See* Def.'s Mot. at 8-9. In short, the government argues that it satisfied its obligation simply by "directing" the O&G lessees to furnish the requisite data and then "providing" whatever data they produced to Rocky Mountain, regardless of whether the data conformed to that enumerated in Exhibit A. *See* Hr'g Tr. 7:18-21 (Sept. 26, 2019) ("[W]hether, number one, the oil and gas lessees actually complied with that directive or, number two, whether they even could comply with it is not a matter of whether BLM breached. All BLM had to do was direct.").[4] On this reading of the Agreement, BLM avers that it had no obligation to provide Rocky Mountain with "any data beyond what the oil and gas lessees provided to BLM, nor to create or independently 'obtain' data that did not exist, or that the oil and gas lessees did not possess." Def.'s Mot. at 9. Stated differently, the government contends that it was not required to give Rocky Mountain anything that the O&G lessees did not provide.

Rocky Mountain, on the other hand, argues that it is entitled to summary judgment because, while BLM provided all the data it received from the O&G lessees, there is no genuine dispute of material fact that the O&G lessees did not provide key elements of the data required by Exhibit A. *See* Pl.'s Cross-Mot. at 2. Importantly, Rocky Mountain asserts, the Agreement "did not give BLM the option of only providing [Rocky Mountain] with the [d]ata it received" in response to its directive to the O&G lessees. *Id.* at 4. Thus, Rocky Mountain's core contention is that the agreement contains "no escape clause for the required [d]ata if the O&G Lessees do not provide it, nor is there any contractual excuse if the O&G Lessees claim it does not exist." *Id.* And, Rocky Mountain asserts that because the O&G lessees and BLM did not provide the data required by Exhibit A, *see id.* at 3, Rocky Mountain's obligation to pay was never triggered, *see id.*

---

[4]The date will be omitted from further citations to the hearing transcript.

### A.  BLM's Obligations Under the Settlement Agreement

On the government's reading of the Agreement, BLM could satisfy its obligations by simply providing Rocky Mountain with whatever data the O&G lessees supplied in response to BLM's direction, regardless of whether those data were entirely consonant with the data identified in Exhibit A.  The resulting question is whether the government's interpretation is consistent with the plain meaning of the Agreement's terms and structure or whether it circumvents the explicitly stated essence of the Settlement.

The "starting point" in contract interpretation "is the plain language of the agreement." *Cheaves*, 108 Fed. Cl. at 409.  The Agreement required BLM to "direct" the O&G lessees to provide the data defined in Exhibit A.  Employed as a transitive verb, "direct" means "[t]o order, appoint, prescribe (a thing to be done or carried out)." *Direct, Oxford English Dictionary*, https://www.oed.com/view/Entry/53294?rskey=CzdnI1&result=3&isAdvanced=false#eid (last visited Oct. 8, 2019).  Correlatively, as defined in Black's Law Dictionary, "direct" means "[t]o cause (something or someone) to move on a particular course" or "[t]o instruct (someone) with authority." *Direct*, *Black's Law Dictionary* (8th ed. 2004).  These dictionary definitions are helpful but not conclusive.  They indicate that BLM was required to order, instruct, or cause the O&G lessees to perform an action, *i.e.*, provide the data enumerated in Exhibit A, yet use of the word "direct" does not explicitly call upon BLM to act if that direction was not carried out.  Was BLM required to take at least some reasonable steps to obtain the requisite information if the oil and gas lessees did not provide basic data?

Consideration of the text and structure of the Agreement addresses this question.  *See generally Hunt Const. Grp., Inc.*, 281 F.3d at 1372 ("[The contract's provisions] must be considered as a whole and interpreted to effectuate [their] spirit and purpose, giving reasonable meaning to all parts.").  In numerous places the language of the Agreement refers to the information BLM was obligated to furnish by using a definite article—"the Data"—and it does so to refer to specific sets of data to be provided in one of two alternative means, namely, those outlined in Exhibit A.  It uses the definite article both when it refers to the information that BLM was to "direct" the O&G lessees to provide and when it mentions the information BLM was ultimately to send Rocky Mountain.  As just one example, two consecutive sentences in the Agreement state that "BLM will direct the O&G Lessees to provide it *the Data*" and that "BLM will provide *the Data* to [Rocky Mountain], after its receipt thereof."  Def.'s Mot. App. at 2-3 (§ II.1) (emphasis added).  Elsewhere, it refers to the "delivery from BLM to [Rocky Mountain] of *the Data* described herein at [Exhibit A]" and the "date of delivery of *the Data* to [Rocky Mountain]." *Id.* App. at 2 (§ I.1) (emphasis added).  The government prefers to interpret "the Data" to mean "the requirements of Exhibit A" in one sentence and to mean "whatever the O&G lessees provide" in the very next sentence.  But the rules of English grammar and usage do not support such a distinction.  In every occurrence where it is used in the Agreement, "the Data" refers to the specific information outlined in Exhibit A.

The structure of Exhibit A also contravenes the government's interpretation.  The data specifications were crafted in such a way to ensure that Rocky Mountain received enough information to conduct its analysis of the feasibility of recovering helium from the extracted gas streams.  Allowing two alternative methods for providing data supplied a measure of assurance

that Rocky Mountain would receive the minimum information it needed even if some of the raw data it might prefer was unavailable.  That careful crafting of Exhibit A is undermined by a reading of the Agreement that allows BLM to provide less than all the information required by either Paragraph 1 or Paragraph 2.  If BLM could ultimately furnish incomplete data in any event, then creating a mechanism for providing statements, current analyses, and estimates (allowed by Paragraph 2) in lieu of potentially unavailable records (required by Paragraph 1) would serve no purpose.  The government's understanding would thus render ineffectual Exhibit A's alternative system.  *See State of Ariz., By and Through Ariz. Dep't of Transp. v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978) (noting that a contract "interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result") (citations omitted).

The government's reading is also at odds with the Agreement's stated purpose.  The Agreement recognized that "helium is a valuable resource," and it was designed to facilitate the future "recovery of helium" by reinstating the original extraction contract.  Def.'s Mot. App. at 1. It was for this reason that the Agreement created a mechanism for Rocky Mountain to obtain information which it could then use to make decisions about whether, and how best to pursue, helium recovery.  Under the government's interpretation, however, BLM could satisfy its obligations so long as it delivered whatever it received from the O&G lessees—even if that information was inadequate for Rocky Mountain to conduct its analysis.  If the lessees failed to provide most or all the data, the government's contention becomes manifestly unreasonable because the whole purpose of the data-provision requirements would be thwarted if BLM could satisfy its obligation by simply forwarding obviously inadequate data to Rocky Mountain.  A reading that would permit BLM to complete its information-providing function by merely producing whatever data the O&G lessees provided—even if what was provided fell short of what was required by Exhibit A—is fundamentally inconsistent with the stated purpose of the contract.  That understanding would essentially allow BLM to circumvent the data-providing obligation, and such a reading is incompatible with the plain terms of the Agreement.  The plain meaning and manifest purpose of the Agreement are to furnish Rocky Mountain with the data outlined in either Paragraphs 1(a)-(d) or 2(a)-(d) of Exhibit A of the Settlement Agreement.  To the extent that BLM did not provide the specified data, it negated the essence of the Agreement.

Related provisions of the Agreement also blunt the thrust of the government's arguments. Section II of the Agreement sets out "Terms for the Recovery of Helium," governing what BLM was to require of the O&G lessees if Rocky Mountain desired to proceed with helium-recovery facilities.  *See* Def.'s Mot. App. at 2.  The O&G lessees presumptively would need to install new facilities to enable Rocky Mountain to be sent helium-bearing gas.  *Id*.  The stated standard BLM was to apply was "whether the items of the proposal [by the O&G lessees for installation of new facilities] are reasonably necessary to effectuate delivery of the helium-bearing gas (the 'Vent Stream') to R[ocky Mountain] for helium recovery."  *Id*. App. at 3 (§ II.3).  The Agreement gave BLM some discretion in the mode of its interaction with the O&G lessees, but it provided an overarching obligation on BLM's part:

The manner in which BLM directs the O&G Lessees to fulfill their helium recovery obligations under the O&G Leases in accordance with the

8

Agreement shall be at BLM's sole discretion.  However, BLM agrees to take
whatever steps are necessary, including issuance of direct written orders to the
O&G Lessees—in form and content to be determined by BLM alone—to meet
the terms for helium recovery described herein.

*Id*. App. at 5 (§ III.6).  In short, BLM had discretion in how it directed the O&G lessees to
perform their obligations under their O&G leases, but BLM was to "take whatever steps are
necessary" to "meet the terms for helium recovery" set out in the Agreement.  *Id*.  To the same
general effect is another provision of the Agreement, which conditioned Rocky Mountain's
release of its obligations upon BLM's "good faith performance" of its obligations:

After good faith performance of the BLM's obligations under this Settlement
Agreement and the Contract, R[ocky Mountain] hereby releases BLM, the
Department of the Interior and the United States from any liability in
connection with R[ocky Mountain]'s Appeal now pending (CBCA, No. 159).

*Id*. App. at 5 (§ III.2).  These provisions emphasize that BLM's obligations under the Agreement
were not perfunctory but rather required taking necessary steps to implement the Agreement's
provisions.

### B.  BLM's Performance Under the Settlement Agreement

Having determined that BLM was contractually obligated to provide Rocky Mountain
with the data specified in either Paragraphs 1(a)-(d) or 2(a)-(d) of Exhibit A, the court next turns
to whether BLM satisfied that obligation.  The court concludes that it did not.

BLM insists that it provided all the data required by Paragraph 2(a)-(d) but with an
important caveat: "to the full extent it existed."  Def.'s Reply at 10.  In other words, BLM
concedes that it provided the data required "*except* that which does not exist (namely, the Vent
Stream quantities)."  Def.'s Mot. App. at 148 (emphasis added).  BLM emphasizes that it did
provide the *cumulative* totals of natural gas produced from the leased lands, *see* Pl.'s Cross-Mot.
at 14, but not wellhead-specific information.  *Id*.  BLM did not, however, provide any vent
stream quantities, whether cumulative or on a daily basis, and it provided a vent stream analysis
for one day out of a 720-day period.  *See* Pl.'s Cross-Mot. at 13; *id*. App. at 116-17 (Ex. 5 at
71:16 to 72:2 (Dep. Of Denny Migl (Dec. 6., 2018))).  Those data were manifestly insufficient
for any assessment of whether there was a commercially sufficient amount of helium in the vent
stream from the Badger Wash Gas Plant, where helium would be present and potentially
recoverable.  Paragraph 2 of Ex. A to the Agreement required BLM to submit "statements[]
prepared consistently with industry standards and practices and verified by a qualified petroleum
engineer and/or geologist."  Def.'s Mot. App. 8 (Ex. A § 2).  The language of the contract thus
expressly incorporates industry standards, and Paragraph 2(d) explicitly requires statements
covering "the most recent twenty four [24] month period."  *Id*. App. at 9 (Ex. A § 2(d)).  When
no quantities of the vent stream gases were provided, Rocky Mountain was forestalled from

performing a reasonable analysis of helium recovery, wholly apart from other data omissions.[5] BLM argues that the Badger Wash Gas Plant did not measure the vent stream quantities omitted, and thus no data were available.  *See* Hr'g Tr. 12:9-12, 62:7-11.  Yet, there was no effort to obtain at least partial or current vent stream volumes, and only a very limited analysis of the vent stream composition was provided.  Those omissions strike at the heart of the Settlement Agreement.

Industry standards cannot be irrelevant, particularly when the express language of the contract specifically incorporates industry standards and practices.  The government's argument falls short because those standards indicate that data were required, and thus there is no genuine dispute of material fact that BLM failed to provide the requisite data under Paragraph 2 of Exhibit A of the Settlement Agreement and thereby breached its obligations under the Agreement.[6]

## CONCLUSION

For the reasons stated, the government's motion for summary judgment is DENIED and Rocky Mountain's cross-motion for summary judgment is GRANTED as to liability.

On or before October 25, 2019, the parties are requested to provide a proposed plan and schedule for addressing damages.

It is so **ORDERED**.

s/Charles F. Lettow
Charles F. Lettow
Senior Judge

---

[5]Rocky Mountain compiled a spreadsheet summarizing all the information it received from BLM, *see* Def.'s Mot. App. at 24, listing deficiencies in the data provided.  In addition to the vent-stream quantities and composition required by Paragraphs 2(b) and (d), these asserted deficiencies include gas composition data for at least six wells (Badger Wash #1, Badger Wash #3, Badger Wash #5, San Arroyo #2, Federal No. 1, Govt. #31-1) as required by Paragraph 2(a), *see* Pl.'s Cross-Mot. at 8-9, 31, and monthly wellhead-specific—as contrasted to cumulative— volume data for all but three wells in the Bar-X field as required by Paragraph 2(a), *see id.* at 8-9. Rocky Mountain does not appear to dispute that the reserve estimates required by Paragraph 2(c) were provided, though they consider what was furnished "the bare minimum."  *Id.* at 12.

[6]While the parties dispute the factual question of whether data about wells sourced from outside federal land was required by the Agreement, *see* Def.'s Mot. App. at 148, that factual dispute does not preclude summary judgment because BLM is in breach regardless of the status of those wells.